IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ELC TRANSPORT, INC.,            )
                                )
         Plaintiff,             )
                                )
    v.                          )      1:20CV964
                                )
THE LARSON GROUP, INC. n/k/a    )
TLG OPERATIONS, LLC d/b/a       )
PETERBILT OF CHARLOTTE,         )
                                )
         Defendant.             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before the court is a Motion for Partial Summary Judgment filed by Defendant TLG Operations, LLC ("Defendant"). (Doc. 32.) The motion is directed solely to three categories of damages Plaintiff ELC Transport, Inc. ("Plaintiff") is seeking. (Id.) Plaintiff responded in opposition. (Doc. 35.)[1] Defendant

---

[1] Plaintiff later filed a substitute response brief. (Doc. 40.) The substitute response is substantially the same as the original response. (Compare Doc. 40, with Pl.'s Br. (Doc. 35).) The only difference between the two is that the substitute response includes concluding sentences in Section IV.A that were omitted, evidently by accident, from the original response. (Compare Doc. 40 at 8-9, with Pl.'s Br. (Doc. 35) at 8-9.) For ease of reference, this court will cite to the original response throughout this Memorandum Opinion and Order but notes that all the content cited to therein is also contained in the substitute response.

replied. (Doc. 37.) For the reasons set forth herein, this court will grant in part and deny in part Defendant's motion.

## I.  FACTUAL BACKGROUND

This court reviews the facts and all reasonable inferences in the light most favorable to Plaintiff. Scott v. Harris, 550 U.S. 372, 378 (2007).

Evander Chavis is Plaintiff's president and sole owner. (Videoconference Dep. of Evander Chavis Taken on Behalf of the Def. ("Chavis Dep.") (Doc. 33-2) at 5–6.)[2] Plaintiff owns and operates trucks to transport goods. (Am. Compl. (Doc. 15) ¶ 4; Chavis Dep. (Doc. 33-2) at 6.) In December 2018, Plaintiff owned a 2017 Peterbilt Model 579 truck with the VIN number 1XPBD49X0HD440601 ("Truck"). (Am. Compl. (Doc. 15) ¶ 12; see Chavis Dep. (Doc. 33-2) at 11.) Defendant does business as Peterbilt of Charlotte and offers maintenance and repair services for Peterbilt trucks. (Am. Compl. (Doc. 15) ¶¶ 2–3, 5; Chavis Dep. (Doc. 33-2) at 12–13.)

On December 18, 2018, Plaintiff brought the Truck to Defendant for diagnostics and repairs after at least one of the Truck's engine warning lights lit up. (Doc. 33-1 at 1; Chavis

---

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

Dep. (Doc. 33-2) at 13.) Plaintiff authorized Defendant to make certain repairs to the Truck. (Doc. 33-1 at 2.) On December 29, 2018, Defendant notified Plaintiff that the Truck was ready for pick-up. (Am. Compl. (Doc. 15) ¶ 17; Chavis Dep. (Doc. 33-2) at 18.) After paying for the repairs, Plaintiff discovered that more warning lights were illuminated. (Am. Compl. (Doc. 15) ¶ 18; Chavis Dep. (Doc. 33-2) at 21.) Defendant's employees then began the process of reinspecting the Truck, but Plaintiff stopped them from doing so. (Chavis Dep. (Doc. 33-2) at 21.)

Plaintiff then drove the Truck directly to MHC Kenworth ("MHC"), another service center authorized to repair Peterbilt trucks, for further inspection and repairs. (Id.; Am. Compl. (Doc. 15) ¶ 21.) MHC then diagnosed certain problems with the Truck that Defendant had not detected, most crucially that it needed a new engine harness. (Chavis Dep. (Doc. 33-2) at 21; Doc. 33-8.) Because the engine harness was a Peterbilt part, MHC then reached out to Defendant and directed Defendant to order a replacement harness. (Am. Compl. (Doc. 15) ¶ 23; Chavis Dep. (Doc. 33-2) at 23; see also Doc. 33-3.) On January 9, 2019, MHC stressed to Defendant the importance of getting the harness as soon as possible because it was "an emergency truck down situation." (Doc. 33-3 at 2.)

On at least one occasion, UPS delivered the replacement harness to Defendant but when MHC personnel went to pick it up the part could not be located. (Am. Compl. (Doc. 15) ¶ 27; Chavis Dep. (Doc. 33-2) at 23—24.) Frustrated, Plaintiff subsequently ordered the harness itself from a distribution center in Fancy Gap, Virginia. (Am. Compl. (Doc. 15) ¶¶ 29—30; Chavis Dep. (Doc. 33-2) at 25—26.) To place that order, Plaintiff used the part number for the harness that Defendant had conveyed to MHC. (Chavis Dep. (Doc. 33-2) at 28.) However, the harness that arrived from Fancy Gap was the wrong size for the Truck because Defendant had conveyed the wrong part number. (Am. Compl. (Doc. 15) ¶ 30; Chavis Dep. (Doc. 33-2) at 25—26.) On February 19, 2019, Defendant received a correct engine harness, and MHC picked it up the next day. (Am. Compl. (Doc. 15) ¶ 31; Doc. 33-3 at 1.) MHC then completed the necessary repairs to the Truck. (Am. Compl. (Doc. 15) ¶ 31; Doc. 33-8 at 2.)

The Truck was out of commission for eleven weeks, causing Plaintiff to be unable to work its assigned FedEx Ground run and ultimately leading Plaintiff to lose that run. (Am. Compl. (Doc. 15) ¶¶ 32—33; see also Docs. 33-5, 33-7.) Plaintiff paid $30,000.00 to acquire a new assigned run. (Am. Compl. (Doc. 15) ¶ 33; Chavis Dep. (Doc. 33-2) at 32.)

- 4 -

## II.  **PROCEDURAL HISTORY**

On September 14, 2020, Plaintiff filed suit against Defendant in Davidson County Superior Court. (Doc. 3.) On October 21, 2020, Defendant filed a petition with this court to remove the case from state to federal court on diversity jurisdiction grounds. (Doc. 1.) On January 4, 2021, Plaintiff filed an Amended Complaint in this court. (Am. Compl. (Doc. 15).) The Amended Complaint asserted two claims against Defendant: breach of contract and negligent misrepresentation. (Id. ¶¶ 35—47.) The Amended Complaint also included a request for lost profits. (Id. ¶¶ 48—53.)

On August 23, 2021, Defendant filed a Motion for Partial Summary Judgment, (Def.'s Mot. for Partial Summ. J. ("Def.'s Mot.") (Doc. 32)), along with a supporting brief, (Def.'s Br. in Supp. of Mot. for Partial Summ. J. ("Def.'s Br.") (Doc. 33)). The motion does not seek summary judgment as to either of Plaintiff's claims, but rather only as to three categories of damages Plaintiff is seeking. (Def.'s Mot. (Doc. 32)) Plaintiff responded in opposition. (Resp. to Def.'s Mot. for Partial Summ. J. ("Pl.'s Br.") (Doc. 35).) Defendant replied. (Def.'s Reply Br. in Supp. of Mot. for Partial Summ. J. ("Def.'s Reply") (Doc. 37).) Defendant's motion is now ripe for adjudication.

## III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322—23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718—19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586—87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247—48). "Mere allegations" in support of a party's pleadings without "any significant probative evidence" to support those allegations do not provide sufficient evidence to allow a reasonable jury to resolve a dispute in favor of that party. Liberty Lobby, 477 U.S. at 249 (internal quotation

- 6 -

marks omitted) (quoting First Nat'l Bank of Ariz. V. Cities Serv. Co., 391 U.S. 253, 288, 290 (1968)).

Put another way, simply showing some "metaphysical doubt as to the material facts" is not sufficient to establish a genuine dispute. Matsushita, 475 U.S. at 586—87. In considering whether a genuine issue of material fact exists, the court must be careful not to weigh the evidence or make credibility determinations. Liberty Lobby, 477 U.S. at 255. Instead, the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of that party. Id.

IV. **ANALYSIS**

In response to an interrogatory that directed Plaintiff to "[i]temize in detail any and all damages that you claim in this lawsuit to have sustained as a result of Defendant's actions," Plaintiff asserted five categories of damages: (1) "Peterbilt of Charlotte Services $3,798.46"; (2) "MHC Ken[]worth Repairs $4,826.55"; (3) "Eleven (11) Weeks of Lost Revenue $59,490.31"; (4) "Correct Wiring Harness $1,586.56"; and (5) "New Run from FedEx Ground $30,000.00." (Pl.'s Resp. to Def.'s First Interrogs. ("Pl.'s Interrogs. Resp.") (Doc. 33-4) at 3.) Defendant's partial summary judgment motion is directly solely to the first, third, and fifth categories. (Def.'s Mot. (Doc. 32.)) Each of those categories is addressed in turn.

- 7 -

## A.   Category 1: Peterbilt of Charlotte Services

The first category of damages Plaintiff listed in its interrogatory response was for "$3,798.46" for "Peterbilt of Charlotte Services." (Pl.'s Interrogs. Resp. (Doc. 33-4) at 3.) On December 29, 2018, Plaintiff paid this amount to Defendant for work performed on the Truck. (Doc. 33-6.)

Defendant argues that summary judgment is appropriate as to this category of damages because "[a]warding Plaintiff the cost of work legitimately performed on the Truck by Defendant would result in Plaintiff receiving the windfall of receiving such work for free." (Def.'s Br. (Doc. 33) at 22—23.) Defendant insists that "[t]he fact that Plaintiff is dissatisfied that Defendant did not diagnose and replace the Truck's engine harness is not a basis for Plaintiff to seek reimbursement for other valuable work performed." (Id. at 23.)

Plaintiff does not oppose summary judgment as to this category of damages. (Pl.'s Br. (Doc. 35) at 12.) Plaintiff "concedes that it cannot sustain a damages claim against Defendant for reimbursement for work actually performed on the Truck by Defendant such that Plaintiff would receive the windfall of free work." (Id.)

In light of this lack of opposition, this court will grant Defendant's motion for summary judgment as to Plaintiff's

- 8 -

damages claim in the amount of "$3,798.46" for "Peterbilt of Charlotte Services." (Pl.'s Interrogs. Resp. (Doc. 33-4) at 3.)

## B. **Category 3: Eleven Weeks of Lost Revenue**

Plaintiff's Amended Complaint seeks special damages in the form of lost profits for the scheduled FedEx Ground runs Plaintiff was unable to complete while the Truck was out of commission. (Am. Compl. (Doc. 15) ¶¶ 48—53.) Plaintiff's interrogatory response claims that it suffered "$59,490.31" in damages due to "Eleven (11) Weeks of Lost Revenue." (Pl.'s Interrogs. Resp. (Doc. 33-4) at 3.)

Defendant seeks summary judgment as to this category of damages. (Def.'s Br. (Doc. 33) at 11—16.) Defendant argues that there is no legal basis for Plaintiff to seek lost revenue, as opposed to lost profits. (Id. at 11—12.) Defendant insists that Plaintiff has failed to establish its lost profits to a "reasonable certainty" because it has only provided speculative evidence of lost revenue and failed to provide any coherent evidence of operating expenses. (Id. at 13—16 (internal quotation marks omitted) (quoting McNamara v. Wilmington Mall Realty Corp., 121 N.C. App. 400, 407, 466 S.E.2d 324, 329 (1996)).) Defendant therefore concludes that "without an understanding as to operating costs" "Plaintiff cannot calculate lost profits with reasonable certainty." (Id. at 15.)

- 9 -

Plaintiff counters that there is evidence from which Plaintiff's loss profits can be derived with reasonable certainty. (Pl.'s Br. (Doc. 35) at 5—8.) Specifically, Plaintiff maintains that operating costs—and hence profitability—can be extrapolated from Chavis' testimony, FedEx Ground statements, tax return documentation, and payroll summaries. (Id. at 8.)

"Under North Carolina law, the party seeking lost profits bears the burden of proof, and to meet that burden, a party must prove such losses with reasonable certainty." Ross v. Washington Mut. Bank, 566 F. Supp. 2d 468, 482 (E.D.N.C. 2008) (internal quotation marks omitted) (quoting McNamara, 121 N.C. App. at 407, 466 S.E.2d at 330), aff'd sub nom. Ross v. FDIC, 625 F.3d 808, 819 (4th Cir. 2010). "Although absolute certainty is not required, damages for lost profits will not be awarded based on hypothetical or speculative forecasts." McNamara, 121 N.C. App. at 407—08, 466 S.E.2d at 329; accord Tillis v. Calvine Cotton Mills, Inc., 251 N.C. 359, 366, 111 S.E.2d 606, 612 (1959) ("Absolute certainty is not required but evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion."); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 343 (4th Cir. 1998). "[T]he quality of evidence of lost profits" is to be evaluated "on an individual case-by-case basis" to determine whether the

"reasonable certainty" standard may be established. <u>Iron Steamer, Ltd. v. Trinity Rest., Inc.</u>, 110 N.C. App. 843, 847—48, 431 S.E.2d 767, 770 (1993); <u>accord</u> <u>Broussard</u>, 155 F.3d at 343. When adjudicating loss profit claims brought by truck operators, the North Carolina Supreme Court has required plaintiffs to show "the revenue [a] plaintiff would have received for the services less the costs and expenses of transporting the goods." <u>Tillis</u>, 251 N.C. at 366, 111 S.E.2d at 612—13. Specifically, as to evidence of "the costs and expenses of transporting . . . goods," "the jury must hear facts with reference to the cost of wages, equipment repair, reserve for equipment replacement, gasoline, oil, greasing and servicing equipment, . . . license and property taxes, tolls, social security taxes, cargo and liability insurance, workmen's compensation insurance and other similar costs." <u>Id.</u> at 366–67, 111 S.E.2d at 612–13.

Here, Plaintiff attempts to prove its lost profits to a reasonable certainty via historical data. Plaintiff's methodology begins by taking the amount of revenue the Truck earned from FedEx Ground in a specific week in November 2019, the month before the Truck was taken to Defendant for repairs. (Doc. 33-5.) The Truck grossed $5,408.21 that week. (<u>Id.</u>) Plaintiff then multiplies that amount by eleven, the number of weeks the Truck was out of commission, to come to a total lost

- 11 -

revenue figure of $59,409.31. (Id.) Problematically, Plaintiff never reduces this total by its operating expenses—namely "the costs and expenses of transporting the goods," Tillis, 251 N.C. at 366, 111 S.E.2d at 613—to come to a lost profit amount.

As a threshold matter, this court has concerns about Plaintiff's rather crude projected revenue calculation. Using revenue data from a single week as opposed to the average of multiple weeks may skew the projection's accuracy because the revenue the Truck produces may fluctuate daily or weekly. Chavis himself acknowledges that such fluctuations do occur. (Chavis Dep. (Doc. 33-2) at 32 ("I can assure you . . . some days might be better some days might not be better.").) Additionally, this court questions whether eleven weeks is too long of a timeframe because it appears to account for the entire period the Truck was out of commission—beginning the day Plaintiff brought the vehicle to Defendant. Even assuming Defendant had made satisfactory and prompt repairs, such repairs would have taken some length of time which must be subtracted from the timeframe. However, these issues go to the weight of the evidence and are not appropriate for summary judgment.

This court is most troubled by Plaintiff's inability or unwillingness to produce coherent operating expense data. Such data is necessary because operating expenses must be subtracted

from lost revenue to ascertain lost profits with reasonable certainty. Tillis, 251 N.C. at 366, 111 S.E.2d at 612—13. Indeed, even Chavis seems to recognize that had the Truck not been in the shop and been able to fulfill its FedEx Ground runs it would have netted less than $59,409.31 in actual profits for Plaintiff. (See Chavis Dep. (Doc. 33-2) at 32 ("[T]hat $5,408.21, you're not taking every dollar of that and putting it in your pocket[?] -- A: No. That's just what the truck would have grossed.").) Plaintiff never specifies what its operating expenses have been historically or would have been during the putative lost profit timeframe. Instead, it points to two evidentiary sources from which it contends its operating expenses can be derived: (1) Chavis' testimony, and (2) a variety of financial records produced during discovery. (Pl.'s Br. (Doc. 35) at 8.)

Defendant concedes that because of Chavis' role as Plaintiff's owner and president he could conceivably give non-expert testimony as to Plaintiff's lost profits, so long as he has "particularized knowledge" regarding Plaintiff's profitability. (Def.'s Reply (Doc. 37) at 2—3 (quoting Lord & Taylor, LLC v. White Flint, L.P., 849 F.3d 567, 576 (4th Cir. 2017).) However, Defendant maintains that statements made by Chavis during his deposition suggest that he does not have such

particularized knowledge. (Id.) One statement concerns the fact that an outside accountant, rather than Chavis, does Plaintiff's accounting work. (Id. at 3 (citing Chavis Dep. (Doc. 33-2) at 34).) Without more, that Plaintiff uses a third-party accountant to aid its tax return preparation does not mean that Chavis necessarily lacks particularized knowledge of Plaintiff's profitability. To the contrary, Chavis indicated that he personally works with the outside accountant by providing the accountant with financial information necessary to prepare Plaintiff's tax return. (Chavis Dep. (Doc. 33-2) at 34.)

Other statements by Chavis are far more indicative that he may lack particularized knowledge of Plaintiff's profitability. During his deposition he readily admitted that he had not done any analysis of the Truck's operating costs:

> **Q: Let's look at Eleven Weeks of Lost Revenue. How did you calculate that number?**
> A: That is calculated by the revenue that we looked back on that truck making or could have made from generated revenue from FedEx Ground reports.
>
> . . . .
>
> **Q: And so have you done any analysis, with respect to your claimed lost revenue, have you done any analysis of the things you didn't have to pay for because the truck was not out running?**

A: Mr. Smith, can you see that right there?[3]
**Q: Yeah.**
A: That's my analysis, sir.

        . . . .

**Q: All I'm getting at is those eleven weeks, when the truck was down, you weren't paying drivers to drive the truck. Right?**
A: That's nowhere in there calculated. You see anything that says anything about drivers?
**Q: I don't. That's — I'm asking you if you've done that.**
A: We didn't calculate driver's pay, no. You can't calculate the driver's pay because there's no miles.
**Q: Okay. And you didn't calculate the fuel that you would have had to pay for?**
A: There's no – there's no fuel in that list.
**Q: Okay.**
A: At all.
**Q: All right. That's all that I was getting at. You have — that you — haven't tried to calculate that. Thank you.**
A: You can't. No.

(Chavis Dep. (Doc. 33-2) at 30—31.) In this exchange, Chavis not only unequivocally admits to having made no analysis of the Truck's operating costs during the putative lost profit period, he also voluntarily and repeatedly asserts that (at least in regards to driver pay and fuel) such an analysis cannot be done. (Id. at 31.) He declares "[y]ou can't calculate the driver's pay because there's no miles," and when Defense Counsel states "you

---

[3] Chavis is referring to the exhibit showing the amount of revenue the Truck grossed from FedEx Ground during a week in November 2019 and Plaintiff's interrogatory response in which it claims $59,490.31 in lost revenue. (Doc. 33-5; Pl.'s Interrogs. Resp. (Doc. 33-4) at 3).)

haven't tried to calculate [fuel]," Chavis flatly responds that "[y]ou can't." (Id.)

If Chavis' statements that these future operating costs cannot be ascertained are taken at face value, which they must for purposes of summary judgment, Liberty Lobby, 477 U.S. at 255 (holding that a judge must not make "[c]redibility determinations . . . whe[n] he is ruling on a motion for summary judgment"), this court cannot see how future profits can be estimated with the requisite "reasonable certainty," McNamara, 121 N.C. App. at 407, 466 S.E.2d at 329. Even assuming, arguendo, that this court could disregard Chavis' statements in the hope that a jury could piecemeal fragmented operating expense data from other statements by Chavis, (e.g., Chavis Dep. (Doc. 33-2) at 8 (stating that if Plaintiff's drivers "run 2,000 miles, then they're paid . . . . 65 cent a mile") and a variety of scattered financial records produced during discovery, (Docs. 35-3, 36, 36-1, 36-2, 36-3, 36-4), this court is unconvinced that such data would be "sufficiently specific and complete to permit the jury to arrive at a reasonable," non-speculative lost profit projection, Tillis, 251 N.C. at 366, 111 S.E.2d at 612; accord McNamara, 121 N.C. App. at 407—08. As the North Carolina Supreme Court has held, to award lost profits to a truck operator "the jury must hear facts with reference to the cost of" over a dozen

categories of expenses. <u>Tillis</u>, 251 N.C. at 367, 111 S.E.2d at 613. Much of this raw information may be contained in the scattered financial records Plaintiff produced. But given that Plaintiff has been unable or unwilling to extrapolate from these records <u>any</u> direct operating cost projections for the Truck, nevertheless a reasonably certain projection, this court questions whether the jury would be able to do so. Furthermore, to allow the jury to attempt to calculate operating expenses would ignore the unequivocal statements from Chavis—who has worked for Plaintiff for over a decade and been its president and sole owner since 2014, (Chavis Dep. (Doc. 33-2) at 5—6)—that "[y]ou can't" make such projections, (<u>id.</u> at 31).

This court concludes that summary judgment must be granted as to Plaintiff's lost profit damage request because Plaintiff's operating expenses for the claimed eleven weeks of lost revenue cannot be determined with reasonable certainty. Because of this "absence of evidence to support" any specific operating expense projection, lost profits cannot be derived from lost revenue with reasonable certainty. <u>Celotex</u>, 477 U.S. at 325. Given Chavis' statements regarding the impossibility of projecting operating expenses and Plaintiff's failure to come forward with specific facts to rebut those statements, there is no "genuine dispute" of "material fact" or issue for trial as to Plaintiff's

lost profits. Fed. R. Civ. P. 56(a); McLean, 332 F.3d at 718—19.
Even viewing the facts in the light most favorable to Plaintiff,
Liberty Lobby, 477 U.S. at 255, it would be unreasonable to
assume that a jury could determine with reasonable certainty
Plaintiff's lost profits when Plaintiff has not done so. Thus,
this court will grant Defendant's motion for summary judgment as
to Plaintiff's claimed lost profits generally, and in the amount
of "$59,490.31" for "Eleven (11) Weeks of Lost Revenue," in
particular. (Pl.'s Interrogs. Resp. (Doc. 33-4) at 3.)

## C.  Category 5: New Run from FedEx Ground

The fifth and final category of damages Plaintiff listed in
its interrogatory response was for "$30,000.00" for a "New Run
from FedEx Ground." (Id.) Plaintiff justifies this claimed
damage by insisting that "[a]s a result of Defendant's breach,
Plaintiff was taken out of service at FedEx Ground, and
Plaintiff lost the run assignments for the Truck. Plaintiff had
to purchase a dedicated run with FedEx in the amount of $30,000
to put the Truck back in service at FedEx Ground." (Am. Compl.
(Doc. 15) ¶ 33.)

As a preliminary matter, this court will grant summary
judgment insofar as Plaintiff's ability to recover the cost of
the replacement FedEx Ground run pursuant to its breach of
contract claim. Defendant argues that even if Plaintiff succeeds

- 18 -

on this breach of contract claim, it will not be entitled to
damages for the cost of the replacement FedEx Ground run. (Def.'s
Br. (Doc. 33) at 16—21.) Plaintiff does not challenge this
argument by Defendant and accordingly summary judgment will be
granted. (See Pl.'s Br. (Doc. 35) at 9–11.)

However, Plaintiff does insist that it can still recover
the cost of the replacement FedEx Ground run "based upon its
claim for negligent misrepresentation." (Id. at 9.) Defendant
disagrees, arguing that Plaintiff is unable to do so pursuant to
its negligent misrepresentation claim because Plaintiff pled this
category of damages "expressly and only in the context of its
breach of contract claim." (Def.'s Reply (Doc. 37) at 6.)
Defendant argues that Plaintiff must not be allowed to "re-
categorize this damages claim as arising under its negligent
misrepresentation claim in an effort to avoid summary judgment."
(Id.)

This court rejects Defendant's argument and concludes that
Plaintiff may properly seek the cost of the replacement FedEx
Ground run under its negligent misrepresentation claim.
Defendant's only rationale as to why this is improper is that
Plaintiff's Amended Complaint uses the language "[a]s a result of
Defendant's breach" before describing the replacement FedEx
Ground run damages. (Id. (internal quotation marks and some

emphasis omitted) (quoting Am. Compl. (Doc. 15) ¶ 33).) This
court first notes that this language is not under the heading for
either the breach of contract claim or the negligent
misrepresentation claim. (Am. Compl. (Doc. 15) ¶ 33.) And second,
although Defendant interprets Plaintiff's use of the word
"breach" to be referring to its breach of contract claim, the
word could fairly be interpreted to be referring to its negligent
misrepresentation claim. The negligent misrepresentation claim
also arises from an alleged breach by Defendant—that is breach of
its duty to prepare information with reasonable care. (See id.
¶ 45); see also Raritan River Steel Co. v. Cherry, Bekaert &
Holland, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988).

In its reply brief, Defendant argues that even assuming the
cost of replacing the FedEx Ground run could be sought under the
negligent misrepresentation claim, summary judgment should still
be awarded because Plaintiff cannot establish two of the
negligent misrepresentation claim's elements—namely duty and
proximate cause. (Def.'s Reply (Doc. 37) at 7—12.) This argument
is facially problematic because it seeks summary judgment on the
merits of Plaintiff's negligent misrepresentation claim, not on
the remedy sought pursuant to that claim. Defendant's partial
summary judgment motion is not so broad. (See Def.'s Mot. (Doc.
32).) It conspicuously does not seek summary judgment on either

- 20 -

of Plaintiff's claims. (Id.) Rather, it is expressly circumscribed to merely seek summary judgment on three categories of Plaintiff's damages. (Id.) Defendant's brief in support of its partial summary judgment motion is to like effect. (Def.'s Br. (Doc. 33).)

Therefore, this court declines to find Defendant's reply brief argument, regarding Plaintiff's ability to establish two of the negligent misrepresentation claim's substantive elements, appropriately responds to any new arguments raised in Plaintiff's response. A reply brief is limited to "matters newly raised in the response." LR 56.1(e). Plaintiff's response cannot be fairly read to raise an argument as to duty or proximate cause as Defendant did not challenge those elements in its opening brief. If the court were to consider Defendant's reply brief argument, then it would require adjudication of more than the merits of Plaintiff's measure of damages and would take the court well outside the scope of Defendant's narrow partial summary judgment motion. While Defendant accuses Plaintiff of "attempt[ing] to pivot" in briefing, (Def.'s Reply (Doc. 37) at 5), it is actually Defendant who has done so. This court will not countenance Defendant's attempt to "re-categorize" (to use Defendant's phrasing, (id. at 6)), its partial summary judgment

motion as one directed towards the merits of Plaintiff's negligent misrepresentation claim.

To summarize, this court will grant Defendant's motion insofar as it seeks summary judgment on Plaintiff's ability to recover "$30,000" for a "New Run from FedEx Ground" under its breach of contract claim. (Pl.'s Interrogs. Resp. (Doc. 33-4) at 3.) However, it will deny the motion insofar as it seeks summary judgment on Plaintiff's ability to recover this category of damages under its negligent misrepresentation claim.

## V.   CONCLUSION

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant's Motion for Partial Summary Judgment, (Doc. 32), is **GRANTED IN PART** and **DENIED IN PART.**

The Motion is **GRANTED** with regard to Plaintiff's ability to seek damages for Peterbilt of Charlotte services, Plaintiff's request for loss profits and/or revenue, and Plaintiff's ability under its breach of contract claim to seek damages for the cost of replacing its FedEx Ground run.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Summary Judgment, (Doc. 32), is **DENIED** with regard to Plaintiff's ability under its negligent misrepresentation claim to seek damages for the cost of replacing its FedEx Ground run.

This the 7th day of March, 2022.

_____
                United States District Judge